UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                                               :

UNITED STATES OF AMERICA,                    :

                                       -v-                               :                       17-CR-602 (JMF)

HEATHCLIFF GOMEZ, a/k/a "Flit," and        :          MEMORANDUM OPINION
JEFFREY COLLADO,                            :                AND ORDER

                               Defendants.          :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Defendants Heathcliff Gomez and Jeffrey Collado are charged in a three-count indictment with (1) conspiracy to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951; (2) conspiracy to violate the narcotics laws, in violation of Title 21, United States Code, Section 846; and (3) possession of firearms in furtherance of the robbery and narcotics conspiracies, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2. (Docket No. 8).[1] Those charges arise from a "reverse sting" operation in which a paid confidential source (the "Confidential Source"), working under the supervision of the Drug Enforcement Administration ("DEA"), allegedly enticed the Defendants to participate in the armed robbery of what they believed would be a shipment of heroin. (*See* Docket No. 1). Gomez now moves to suppress statements he made following his arrest. (Docket No. 14 ("Gomez Ltr.")). Collado (joined by Gomez) moves for disclosure of the identity of the Confidential Source and for immediate disclosure of impeachment materials concerning that

---

[1] Although Collado's first name is spelled "Jeffery" in the indictment (*see* Docket No. 8), it is spelled "Jeffrey" on the docket and in Collado's own submissions. (*See, e.g.*, Docket No. 21). The Court presumes that Collado's own spelling is the correct one.

source. (Docket Nos. 13, 15 ("Collado Mem.")). Upon review of the parties' submissions, (Docket Nos. 14-15, 16 ("Gov't Opp'n Mem."), 21-22), the Court denies Gomez's motion and grants in part and denies in part Collado's motion.

## SUPPRESSION OF GOMEZ'S POST-ARREST STATEMENTS

It is well established that an "accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [his *Miranda*] rights when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (internal quotation marks omitted). A waiver need not be in writing. *See, e.g.*, *United States v. Maldonado-Rivera*, 922 F.2d 934, 972-73 (2d Cir. 1990) (affirming the admission of statements made by a defendant after he was orally advised of his *Miranda* rights and stated that he understood those rights, despite his refusal to sign a *Miranda* waiver form); *United States v. Downs*, No. 13-CR-152, 2014 WL 3736056, at *5 (D. Vt. July 29, 2014) (same). Instead, an accused's "indication at the time the warnings are given that he understands them and wants to speak to police is strong evidence of a knowing waiver." *United States v. Rijo-Carrion*, No. 11-CR-784 (RRM), 2012 WL 6617388, at *5 (E.D.N.Y. Dec. 19, 2012). If a suspect invokes his *Miranda* rights, however, "interrogation must stop and the invocation must be scrupulously honored." *United States v. Gonzalez*, 764 F.3d 159, 165 (2d Cir. 2014) (internal quotation marks omitted). That said, "for a defendant successfully to invoke his *Miranda* rights, he must do so through a clear, unambiguous affirmative action or statement." *United States v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011). "If an accused makes a statement . . . that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis*, 560 U.S. at 381 (citations and internal quotation marks omitted).

Even where an accused has waived his *Miranda* rights, due process prohibits the prosecution from using (at least in its case in chief) statements not made voluntarily to law enforcement. *See, e.g.*, *J.D.B. v. North Carolina*, 564 U.S. 261 (2011). A statement is involuntary if it is obtained "under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (internal quotation marks omitted); *see Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (stating that the critical inquiry is whether the defendant's will was "overborne" by the conduct of law enforcement officers such that his statements cannot be deemed to be the "product of a rational intellect and a free will"). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). Relevant factors include the age of the accused, education level, intelligence, extent of advice regarding constitutional rights, length of detention, repeated and prolonged nature of the questioning, and the use of physical punishment, such as the deprivation of food or sleep. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also, e.g.*, *United States v. Taylor*, 745 F.3d 15, 23-25 (2d Cir. 2014). Compliance with the dictates of *Miranda* is, as discussed, not dispositive — but it is a significant factor weighing in favor of a finding of voluntariness. *See, e.g.*, *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

Applying the foregoing standards here, Gomez's motion is easily denied without a hearing. Gomez contends that his post-arrest statements should be suppressed because the agents present at his arrest and during the interview were armed; he was denied food and drink for "hours" prior to the interview; he was denied access to his medication and, thus, felt panicked; and the interrogating agents employed "strategies and tactics," alternating between being

"solicitous" and "sarcastic to the point of being dismissive." (Gomez Ltr. 3-8). These claims, however, are belied by the undisputed evidence — including, most notably, a videotape of the post-arrest statement itself. That evidence makes clear that the interview took place just under three hours after Gomez was arrested; that the interview was conducted by agents who were *not* visibly armed and who behaved in a professional manner throughout; that Gomez requested, and was given, water during the interview; and that when Gomez asked for his medication at the conclusion of the interview, the agents responded affirmatively ("Yeah") before calmly stating that they would take him to the hospital to make sure he was "all right with everything." Equally important, Gomez appears calm and coherent throughout the interview, showing no visible signs of distress or lack of understanding. That is, his demeanor, tone of voice, and coherent answers to the agents' questions — not to mention his invocation of the right to counsel when the agents finally revealed that they had reason to believe that he was lying (an invocation that the agents immediately honored) — all support a finding of voluntariness.

The fact that Gomez "flatly refused to sign or even initial the proffered Miranda form at the beginning of his interrogation," (Docket No. 22 ("Gomez Reply"), at 1), is immaterial. The videotape makes plain that an agent read Gomez his *Miranda* rights; that Gomez indicated his understanding of those rights; and that Gomez agreed to answer the agents' questions. No more is required. *See, e.g.*, *Rijo-Carrion*, 2012 WL 6617388, at *5. Gomez's statement, when asked if he would answer some questions, that he was "mute," (Gomez Ltr. 7-8), is similarly irrelevant. Gomez weakly suggests that the statement shows he "actually tried to assert his right to remain silent on being read his *Miranda* rights," (*id.* at 7), but, in context, it is better understood to mean that he had nothing to say until the agents explained why he had been arrested. It certainly was

4

not the "unambiguous affirmative . . . statement" of his right to remain silent that is necessary to invoke *Miranda*. *Plugh*, 648 F.3d at 124.

Finally, Gomez emphasizes his "pre-existing history of panic disorder and documented related health issues" and asserts that he "repeatedly asked for his medication prior to the interrogation because he was experiencing elevated breathing and panic as a result of his arrest and subsequent detention." (Gomez Reply 2). But the videotape belies any claim that, at the time of the interrogation, Gomez was suffering a panic attack or otherwise of unsound mind. In any event, the Second Circuit has found statements to be voluntary despite much more compelling circumstances of discomfort and disorientation than those Gomez alleges here. *See, e.g.*, *United States v. Siddiqui*, 699 F.3d 690, 706-07 (2d Cir. 2012) (holding that un-*Mirandized* statements made as the defendant was recuperating from surgery to address a gunshot to her stomach and she was "tethered to her hospital bed in soft restraints" were voluntary); *United States v. Khalil*, 214 F.3d 111, 121-22 (2d Cir. 2000) (holding that statements made as the defendant was "being prepared for life-saving surgery" because of a gunshot wound to the leg and in response to questioning as the defendant "underwent several post-surgical procedures" were voluntary where evidence showed that although the defendant "was in pain, he was alert, seemed to understand the agent's questions, and gave responsive answers"); *see also Pagan v. Keane*, 984 F.2d 61, 63 (2d Cir.1993) (holding, on habeas review, that statements made less than three hours after the defendant had been given morphine following emergency surgery for gunshot wounds, when he had a high fever, was required to wear an oxygen mask, and had at least five tubes or catheters connected to his body were voluntary where the interrogating detective testified that the defendant, "though 'weakened,' . . . was 'very alert [and] able to answer all our questions with no problem'" (second alteration in original)).

5

In short, the undisputed evidence — particularly the videotape — suffices to establish, by well more than a preponderance of the evidence, that Gomez's waiver of his *Miranda* rights was knowing and voluntary and that his statements themselves were voluntarily given. Accordingly, Gomez's motion to suppress is denied without a hearing. *See, e.g.*, *United States v. Vaid*, No. 16-CR-763 (LGS), 2017 WL 3891695, at *7-8 (S.D.N.Y. Sept. 5, 2017) (denying a motion to suppress based in part on a videotape showing that the defendant "had no difficulty understanding English or what the agents were telling her"); *see also United States v. Chavez*, No. 14-CR-185, 2015 WL 1650838 (JAM), at *7 (D. Conn. Apr. 14, 2015) (holding that a videotape showing the defendant's repeated statements that he understood his *Miranda* rights "suffice[d] to establish by more than a preponderance of the evidence that the waiver was knowing and voluntary, despite his refusal to sign the form").

## DISCLOSURE OF CONFIDENTIAL INFORMANT INFORMATION

In *Roviaro v. United States*, 353 U.S. 53, 59 (1957), the Supreme Court held that the identities of confidential informants are subject to a qualified privilege. Nevertheless, "the privilege must give way" if "the disclosure of an informant's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause." *Id.* at 60-61. A "defendant is generally able to establish a right to disclosure 'where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence.'" *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (quoting *United States v. Russotti*, 746 F.2d 945, 950 (2d Cir. 1984)). At the same time, it is incumbent upon the defendant to "mak[e] some plausible explanation of the assistance he would . . . receive[] from the testimony." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 871 (1982). Mere "[s]peculation that disclosure of the

informant's identity will be of assistance is not sufficient to meet the defendant's burden; instead, the district court must be satisfied, after balancing the competing interests of the government and the defense, that the defendant's need for disclosure outweighs the government's interest in shielding the informant's identity." *United States v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997) (citing *Roviaro*, 353 U.S. at 62).

In light of those standards, the Court finds that Collado and Gomez have met their burden of showing sufficient need for the Confidential Source's identity here. Indeed, but for the fact that the Defendants' meetings with the Confidential Source were apparently recorded, (*see* Collado Mem. 2), it is hard to imagine a stronger case for disclosure, as the Government's prosecution appears to rest entirely on what happened in the meetings with the Confidential Source. To be sure, the fact that the relevant conversations were recorded lessens the Defendants' need. But Collado represents — and the Government does not dispute — that "the quality of the recordings is such that . . . the content of those conversations, and who said what" are expected "to be hotly disputed at trial." (*Id.*). In those circumstances, the Court concludes that Collado and Gomez have shown that disclosure "is relevant and helpful" to their defense. *Roviaro*, 353 U.S. at 60-61. Accordingly, the informant's privilege "must give way." *Id.*; *see, e.g.*, *United States v. Roberts*, 388 F.2d 646, 648-49 (2d Cir. 1968) (concluding that, if requested by defense counsel, disclosure would have been required under *Roviaro* where the informant "was present during all the significant events" and "was obviously a crucial witness to the alleged narcotics transactions," notwithstanding involvement of an undercover officer in many of the same events); *see also, e.g.*, *Saa*, 859 F.2d at 1073-74 (holding that pretrial disclosure was

required where the confidential informant could shed light on whether one of the defendants was present on a particular occasion).[2]

That said, the Court concludes that immediate disclosure of the Confidential Source's identity and pedigree information is unnecessary to protect the Defendants' rights and would be inappropriate in light of the Government's representation that the Confidential Source is "an active informant for the DEA, who is currently working on multiple ongoing investigations." (Gov't Opp'n Mem. 11). Instead, balancing the Defendants' need against the Government's interest in protecting both the safety of the Confidential Source and the integrity of its ongoing investigations, the Court concludes that disclosure no later than six weeks before trial is appropriate.[3] Additionally, the Court denies Collado's request for immediate disclosure of impeachment material relating to the Confidential Source. The Second Circuit has held that, "as a general rule, *Brady* and its progeny to not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). Instead, *Giglio v. United States*, 405 U.S. 150 (1972), requires disclosure of any materials that might be used to impeach Government witnesses "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." *United*

---

[2] In an effort to provide "a more particularized showing of why the identity and testimony of the [Confidential Source] is 'material to the defense' and essential to the fair determination of this case," Collado's counsel submitted, on an *ex parte* basis, a supplemental affirmation to the Court. (Letter from Gary G. Becker dated Jan. 8, 2018, at 1). In light of the affirmation, Collado's arguments for need are certainly stronger, but disclosure is warranted on the basis of the public record alone. Collado is granted leave to file the affirmation *ex parte* and under seal because it discloses "confidential and privileged possible defenses and strategies." (*Id.*). However, counsel shall promptly file on ECF his cover letter of January 8, 2018, as it was already shared with the Government, (*see id.* at 2), and there is no basis to keep it under seal.

[3] Additionally, some sort of protective order may well be warranted. *See* Fed. R. Crim. P. 16(d). The Government shall confer with defense counsel before moving for any such order.

*States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007); *see also United States v. Ruiz*, 536 U.S. 622, 633 (2002) ("[T]he Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."). Here, the Government represents that it is aware of those obligations and intends to comply with them by disclosing any impeachment material and Jencks Act materials, *see* 18 U.S.C. § 3500, in accordance with the standard practices in this District. (*See* Gov't Opp'n Mem. 14 & n.4). Those representations are sufficient at this juncture.

## CONCLUSION

For the reasons stated above, Gomez's motion to suppress his post-arrest statements is DENIED, and Collado's motion (joined by Gomez) for disclosure of the Confidential Source's identity and impeachment materials is GRANTED in part and DENIED in part. More specifically, no later than six weeks prior to the start of trial in this matter, the Government shall disclose the Confidential Source's identity and pedigree information to the Defendants.

The Clerk of Court is directed to terminate Docket No. 14.

SO ORDERED.

Dated: January 19, 2018
New York, New York

_____
JESSE M. FURMAN
United States District Judge